Second case for the morning is Morris against BNSF Railway. Mr. Neal. Good morning, your honors. May it please the court. Brian Neal for BNSF Railway, appellant and cross-appellee. The court should reverse the judgment here for this plaintiff, Mr. Morris, in this race discrimination case. We've made arguments for judgment as a matter of law and new trial. I plan to start with the judgment as a matter of law and then at least on the new trial argument as an alternative. And I'll start with judgment as a matter of law. Now, you've read the briefs. You understand that the case involves serious rule violations by Mr. Morris that are not disputed. They involved a what's called a key train carrying 86 cars of hazardous material. And Mr. Morris effectively concedes that the actual decision makers on his termination of employment did not act out of discrimination. So he instead relies on what's done to be known as the cat's paw theory concerning one manager, Mr. Hendricks, who acted Mr. Morris claims out of discriminatory animus in denying what's referred to as waiver or alternative handling. Now, there are several problems we've raised with that theory. I'll start with the proximate cause one. First and foremost, we believe the proximate cause should be a dispositive point on appeal because the evidence does not satisfy the proximate cause requirement of the cat's paw theory. This evidence is Mr. Neal. Mr. Hendrickson had granted waiver to Mr. Morris. Would Ms. Smith or Mr. Jenkins have ever seen the case? No. Thank you. And that is essentially the approximate cause argument that opposing counsel make. I would like to ask the court to focus on this court's decision in Woods versus City of Berwyn. In that case, Woods is very, very similar to this case. In that case, the fire chief didn't have authority to discharge, recommended discharge. The process was to then have an independent hearing. That happened. The independent hearing resulted in discharge without any reliance on any factual information from the fire chief. And the court held that the hearing and independent decision broke the chain of causation and precluded proximate cause. But that's true. The problem I have with that argument is that this is a disparate discipline case. It basically goes without saying that Mr. Morris did something for which he could legitimately be and that the rationale for the firing was consistent throughout. But I've got to say, I've never seen a disparate discipline case with more compelling comparator evidence. Is it correct that with these comparators, all of them involve conductors or engineers? Yes. And in all of them, Mr. Hendrickson was in a position to grant a waiver? He had the authority. He was over the overall division. That does not mean he was individually involved in each case. But he had the authority to do so in each of those cases, right? That's right. If it came to his attention, he had the authority to do it. And all or almost all of these comparators involve either speeding trains or similar operational violations that could implicate safety in a serious way and could justify firing, correct? No, no, that's not correct. And that gets into a significant area of dispute among the parties. And our position is that the evidence, in fact, does not show that there is sufficient comparability in those various other comparators. That's mainly a result of your procedures, right? That because the waiver is granted, there's no full investigation in those cases, and you don't get the kind of detailed findings that you have in Mr. Morris's case, right? That's right, Your Honor. But it is still the plaintiff's burden to prove disparate discipline in this type of a case. And sometimes those cases are easier, and sometimes they're much more difficult. And if the nature of the evidence the plaintiff obtains in discovery to do that is insufficient, then it's on the plaintiff to go forward and dig deeper and find what can be found to make that case. So that... You think this case should have been tried with bringing all or maybe 20 of those folks in and just litigated all 20 of those comparators? Well, there had to be some additional, you know, some evidence that allows for an appropriate comparison. And we don't have that. Well, what I'm suggesting, though, is the plaintiff here has gone a long way. We've got all conductors or engineers. Hendrickson is the common denominator in all of them. And all of them are safety violations with varying degrees of severity. But some of them are obviously comparable, such as Mr. Smith or Mr. McCool or Mr. Wyatt. Well, I disagree with that on two fronts, Your Honor. And one is, and I can talk about Mr. Smith in more detail, but I do want to point out that his violations were three years before Mr. Morris's, and they were under a different disciplinary policy that's not in the record. I don't personally know what it says, but Mr. Hendrickson testified that it was more lenient. And was the jury required to accept that explanation from Mr. Hendrickson? Well, of course, I don't have to believe him, but there's no evidence that they were similar, and there's no basis on which a jury could draw a reasonable inference. Mr. Smith intentionally disabled safety equipment and was speeding at 14 miles an hour past the limit, right? Right. And he got a waiver. And then he got a second waiver for another violation, right? Well, that was for a later separate event, right? Yeah. So he obviously didn't learn the lesson from the first waiver. Well, apparently not. So, both of those were under a different disciplinary policy, so that's one issue. But the overarching issue with all of these is none of them were on what's referred to as a key train. And the court's senior briefing on that point, you know, the key train is one carrying hazardous materials. That is a material distinction under this court's cases on what is a proper and what is not a proper comparator. Yes. Mr. Neal, this is Judge Easterbrook. I wonder whether either side conducted a statistical analysis in this case. As you start with the universe of all people who have committed serious safety violations, then you look and see which people get waivers and which don't. And then you determine whether there's any difference by race in the probability of getting a waiver. Did anybody present that kind of evidence in this case? No, Judge Easterbrook. Okay. Thank you. Mr. Neal, it's Judge Scudder. I'm mindful of your time. You've got about 12 minutes left, but I want to make sure that we address the Rule 26 disclosure question. And I have a question for you. Why was Mr. Hendrickson deposed so late in the case? In February of 2019, it looks like about a month before the trial. And Hendrickson is a key figure in the case. Why did that happen? I don't know exactly, Judge Scudder. You saw that there was a different law firm handling the case for BNSF up until, I believe, sometime after the summary judgment ruling. The new lawyers came in, got up to speed, and began correcting some things that we acknowledge were not done nearly as well as they should have been done. And I think my guess is that part of that process included figuring out who their witnesses were going to be at trial and that they needed to get Mr. Hendrickson at trial. He was in Montana, and so they agreed to do it by a trial deposition by both parties. Does the fact that such an important deposition was allowed to occur so late in the case, in your view, have any bearing on how we analyze the Rule 26 issue that you raise? Yes, I think it does. Of course, you've seen our overarching point is more of a legal issue on the Rule 26 point because the district judges have a disagreement with the approach that we think the rules call for. But when you get into looking at the factors as to whether there was harm, one of those is, can something be corrected? And we didn't move for continuance, but the judge brought up the idea of continuance, and our lawyers said, absolutely, we're willing to do that to allow some depositions here, which would have made sense because, as you say, we had just had a deposition not long before that of a key witness in the case, Mr. Hendrickson. Opposing counsel said no to that, and, you know, they say that, well, they don't have to do anything to fix our problem, but I think that the rules don't really put it in that category. They say, is this something, you know, do we want a case to go to trial on a procedural deficiency, or do we want to see if it makes sense and is plausible without prejudice to the other side to go forward? And, you know, that would have been a way. Mr. Niels, how much does a deposition, a day-long deposition cost in Chicago, just in terms of court reporter and transcript for the $1,000? That's, the last time I looked at an invoice, I could be under or over on that, but if we're talking about a full day, I think it's around $1,000. Okay. That sounds optimistic, but, okay. So, if Smith and Jenkins were so critical, why weren't they in the 26A disclosure from the beginning? I, Judge, I don't have an answer to that. Was there an EEOC charge in this case? Yes, there was. And were they mentioned in the EEOC response? Judge, I don't know that. I don't think that that is anywhere in the trial record, and I limited my review to that. Okay. And one of the points that Plaintiff has made in response to all these 26A issues is whether there were any offers of proof with respect to Smith and Jenkins and the excluded testimony from Mr. Dell Pietra. With respect to all of those, there was a formal offer of proof or somewhat formal offer of proof on Mr. Dell Pietra. There was not on Smith or Jenkins, but the rule allows for not having an offer of proof when it's apparent from the context what the testimony would be, and that was explained in the motion in limited briefing and in the pretrial conference that Ms. Smith would be explaining what she did along the way in the discharge review process. Yes, someone had a question. There's been a bit of debate about Mr. Hendrickson's role in this and an interrogatory answer or several that were changed with respect to his role in the decision process that led to Mr. Morris' firing. When were those interrogatory answers changed? I believe it was in January, but it was before Mr. Hendrickson's deposition. It was in 2019. It was, what, a month or two before trial in a case that was intending for four years? I believe that is correct. I'm going to tell you exactly. January 23rd, 2019. That is correct. How should we think about this case in light of all of our cases, sometimes summary judgment, sometimes trial-related, that basically say a party doesn't have a right, the judge can allow, but a party does not have a right to basically radically restructure the case with new theories, let alone entirely new witnesses at such a late stage of the case? I think that it fits in with the cases and it fits in with the language of the rule and the comment that we've quoted, because this is not a radical restructuring, because these are not new people. Everybody knew that Andrea Smith was involved. Mr. Morris talked about her way back in his deposition. She gave a declaration on summary judgment. She fits squarely within the exceptions to the exclusion portion of the rule. It's hard to imagine a more clear situation than Andrea Smith. We've got the exhibit showing her involvement and all of that prior knowledge of her, and the rules explicitly say that there's no duty to supplement if the information has otherwise been made known to the opposing party. The key information that the 26A disclosure provides, as I understand it, is we intend to rely on this person's testimony. Am I wrong about that? I think so, Judge, because I think the comment refers to an exception being when a witness not previously disclosed is identified during the taking of a deposition. So I understand that to mean when the identity of the person who has involvement is revealed during the taking of a deposition, that is an exception to the disclosure rule. And this is a case where, you know, BNSF's, you know, really, this case was gutted based on this, and I'm not trying to explain the earlier events. There were foul-ups early on, but they didn't warrant what the trial judge did here in terms of cutting the case out from under BNSF in the way that it did, especially with somebody like Andrea Smith, who was just critical, and critical, too, to- I understand she's critical to your theory. How does she really help, though, with the minutes ago that she would never have seen these other cases because they all got waivers? Right. And that gets back to the proximate cause point, which is good. The disparate discipline goes to the waiver and alternative handling points. And so that's the initial input that Mr. Hendrickson is alleged to have had in this process. The allegation is his discrimination was denying waiver and alternative handling, the proof- Mr. Henry? From the plaintiffs. Yes. You're into your rebuttal time, but of course you should continue answering Judge Hamilton's question. Okay. Okay. I'll finish that up and then save the rest for rebuttal. Thank you. So that input is the alleged discrimination, and it is equivalent to the more typical cat's paw case that involves an express recommendation of termination. And so that's where the comparators come in. They don't come in later in the process. And back to this Woods case that I was talking about, the very same thing happened there with respect to alleged discriminatory motive in the initial input in the decision, but the court held that that broke the chain. And going back to, I think, Judge Hamilton's question or point, the cat's paw cases in this court often do involve disparate discipline, and the court has not, as far as I've seen, ever made a distinction between how proximate cause is analyzed in the disparate discipline case or in any other. And one of the cases that I'm referring to is the McDaniel case that we cite in our brief. It involved both a similarly situated question and a cat's paw approximate cause question. So it is the same analysis, and Woods is really just on point with our situation in that the same argument here was made there. That is, if the initial alleged animus in the recommendation had not occurred, then the hearing there never would have taken place. And that is the sole argument on the other side about proximate cause. And that may be a cause, a factual cause, but it is not a proximate cause, and the Woods case shows us that. And with that, I'd like to reserve the remainder of my time for rebuttal. Certainly, Mr. Neal. Mr. Fox. Thank you. This is Ed Fox, and I'm the plaintiff for Mr. Morris and the appellee in this case. Just to answer first the question about why Mr. Hendricks' deposition was taken as it was, it wasn't really taken as a discovery deposition in the way you traditionally think about it, but what happened was he was properly noticed in their 26 days. We did want to use the trial. We found out that he was in Montana, so both parties agreed to take what amounted to telephonic deposition testimony, but was intended to be used at trial. So it wasn't really a discovery deposition in the traditional sense. It was intended to be used for trial, and that's why it happened so late, because it was for trial. And then in connection with defendants continually arguing that this is a cat's paw case and so forth, this really isn't a cat's paw case. And the relevant adverse action in this case, and as was pointed out, was the disparate discipline that went on. And we're not arguing that in a cat's paw case, Mr. Hendrickson somehow influenced the people who did the termination, but that's not our argument. We're arguing that the relevant adverse action was Mr. Hendrickson's action in and of itself, and not giving Mr. Morris a waiver, which would have resulted in the case not going to the folks in Texas, including Ms. Smith and Mr. Jenkins. Now, I want to talk a little bit about waivers, and be in a discrimination of Morris by not giving a waiver or alternative handling is what this trial to a jury was about. And an important feature of waiver is BN's ability to abuse the waiver process, because there's virtually no written policy that addresses waiver for BN. There's no written policy describing what it is, there's no written policy describing how it's to be used, and there's no written policy to define the criteria by which it's used. Nevertheless, and as we've seen in many of these comparators, this was the conduct of white employees, but never, never, never used similarly regarding the conduct of black employees. And also in connection with the briefing, I wanted to note what the trial of this case was really not about. Mr. Potts? Yes. Judge Easterbrook? Yes. I asked Mr. Neal whether there was any statistical evidence on either side, and he said no. I think you've just answered that yes. You've said that the waiver process was never used on behalf of black employees. Does the record support that? That's a statistical contention. Yes, the record does support that, because we got information of 24 comparators, they were all put into evidence, not a single one was white, and all of them that committed multiple infractions got waivers. Not a single, they pointed out not a single... No, counsel, maybe my question isn't clear. Your comparators, people who got waivers, were white. The claim you just made was no black person got a waiver. I was wondering what supports that contention. Well, all I can say is none that we know of. We got all the... That's a different point. When I read the briefs, I was thinking, suppose this were a claim against a car manufacturer that it sold lemons to blacks but gave good cars to whites, and the plaintiff is black and got a lemon, and chose 25 white people who got cars that worked just fine. Would that show race discrimination? It seemed to me, no. You'd need to show what percentage of blacks got lemons and what percentage of whites got lemons. It wouldn't be enough just to show that 25 whites got good cars. Now, of course, nobody's made a statistical argument here, but if the record really shows, we have looked carefully at all the black workers who violated the rules and none of them got a waiver, that would be very powerful evidence. That's why I wanted to check off that that's what the record really showed. Unfortunately, you're correct. We didn't get that sort of evidence. We tried to get it. We didn't get it at all. So we can't... In essence, how was that done? We asked them for all the comparators and all the people during the same time period, and then under the supervision of Mr. Hendrickson, because that's what we were focused on, who got waiver and or alternative handling, and who got terminated. That's what we asked for. What we got were the 24 people that we used. Mr. Fox, it's Judge Scudder on the comparators. Do you agree with Mr. Neal that all 24 involved Mr. Hendrickson? The only reason I say that is I'm looking at a chart that we prepared to get ready for oral argument here, and there's an employee named James Deemo, and I thought the company took the position that Hendrickson wasn't involved. I don't want to detain you on that. Do you agree, or is it your position all the comparators are Hendrickson supervisees? I'm that particular employee, and I think this is the only one. We're not clear if Mr. Hendrickson was involved. We think he was, but he left the company around that time, and so we're just not clear if he was still there when that happened. The other question I have for you is on the rule 26A, and that is how could it really have surprised Mr. Morris that the defendant at trial would rely on testimony, the testimony that's been proffered from Andrea Smith and Mr. Della Pietra? In other words, why isn't this just inadvertence and failure to comply with the rule 26E requirement, but known to all in the litigation that these were key players? The fact of the matter is that in addition to the 26A requirements, we also asked an interrogatory, and this is the interrogatory that we've been talking about that was changed, and the interrogatory asked specifically who were all the decision makers that were involved in the termination, and when they answered it, they didn't mention Smith and Jenkins. They just said Hendrickson was the one that recommended termination. Then that interrogatory gets changed, as we know now, January 23rd, about a month before trial. So based on an interrogatory like that, we have every right- How about Smith's declaration at summary judgment? After you read that, did you think she had anything to do with it? Well, so that declaration, I mean, of course, we think there's a possibility with something like that that she might have something to do with it, but that declaration was filed about two years before trial in a summary judgment motion, and they never made any effort to make any changes to their rule 26A disclosures with all that time. They have this interrogatory that's outstanding, and from our perspective, we're focused on the adverse action that we're interested in, which is Mr. Hendrickson's decisions to give waiver or not, and so that's where we're going. So they don't say in the interrogatory she was responsible for anything, and they don't say in the rule 26A. And in the course of litigation like this, which went over at the time of trial four years, there were lots and lots and lots of names mentioned in various contexts. There were other declarations that were given not only by them but by us, and by the way, they kept out one of our, so that just to be clear, what Judge Cannelli did was equal to both sides because they kept out one of our witnesses who also submitted a declaration two years previously. So that was equal opportunity ruling in terms of that, but there were lots of names given out and discussed, and to have a rule that says, well, if a name is disclosed, then you're responsible for being prepared to deal with that person. We just swallow the reason for rule 26A because in litigation like this, tens if not hundreds of names are disclosed in some fashion or another, including... Go ahead, Mr. Clark. Can I ask you the same question? What does it cost to take a deposition in Chicago? So for, like you're talking about an all-day deposition that gets transcribed, it's going to be about $1,200 or $1,300 bucks. Okay. Expenses that plaintiffs don't often, aren't often able to meet on short notice. Well, on short notice, it gets to be much more expensive because then we got to expedite the transcript, and when you expedite it, it doubles and triples the cost. So then you're talking about $2,000 or $3,000 to expedite a transcript like that. Okay. Thanks. That's what happens with that. But at any rate, that's the issue with Andrea Smith, and also, if I may, with regard to Ms. Smith, she wrote an email. She wrote a half a page email about this whole situation, and she didn't have anything to say about comparators in the email. She had something to say about Ron Morris, and her email was in fact discussed by Mr. Henderson, and it was read to the jury. So to the extent that they say they're totally prejudiced about that, that's just not true, and there's not just much more she could offer other than the fact she did this email. She said she recommended determination, and the email said what it said. So they weren't totally prejudiced, and their failure to disclose her is just a problem that if the courts start letting things like this slide, then there's no limit to what might happen, and then Rule 26A is going to be gutted. And that just also reminds me, the defendants say their whole case was gutted because of that. It's just not true because this whole case, from our perspective, was the adverse action, which was the failure to give the waiver or the alternative handling, and frankly, Mr. Henderson was in charge of that. His deposition was taken over seven hours. We examined him. They cross-examined him, and he said everything that could be said about it and was cross-examined about everything that could be said about it. To say their case was gutted was just really an overstatement. Mr. Fox, it's Judge Scudder. It's Judge Scudder. They were able to defend this case, and they had Della Petra come in and testify as well in the case in chief. Another BN employee, Thomas Lynch, testified as well, and frankly, he helped claim this case because he testified that when he had his trained derailment, not only did he get a waiver, he didn't even ask for a waiver. Mr. Fox? Yes. It's Judge Scudder. I want to confirm one thing. I think I'm right about this, but you can confirm it. I know counsel changed throughout the case, and there was a period of time where Mr. Morris was pro se, but I think you'll know the answer. Notwithstanding that change, the changes in counsel, am I right that Mr. Morris's core theory of liability did remain consistent throughout the litigation? Oh, absolutely. And that was the only theory of liability was Mr. Hendrickson's actions. There's a lot of controversy on Mr. Hendrickson's actions at BNSF at that time. And that you were going to litigate this as a disparate discipline case and with indirect proof focusing on comparators. Is that also- Yes. And in fact, when we got involved in the case, our first, and just so you don't think the comparator for a long time, it wasn't until after we got involved and kept insisting on it, which was getting toward the end of litigation, and in fact, after discovery closed, but it had been asked for, that we finally got that information about the comparator, about what Mr. Hendrickson did. And that was the theory- The reason I'm asking that question is because in my mind, and Mr. Neal can tell me I'm mistaken, that's actually material to me with respect to the Rule 26 disclosure issue. It makes the failure to supplement Della Pietra, Smith, and Jenkins all the more inexplicable to me. And of course we agree, and that's especially true in light of the interrogatory answer, which we said who was involved with the decision to terminate, and Smith and Jenkins don't come up, or Della Pietra doesn't come up either, just Hendrickson comes up. Go ahead. Can I just follow up a little bit? In the summary judgment briefing, did you all put in the same comparator evidence? I know that there were some late supplements from the defense, but basically it was the same records to show the comparators in the closing summary judgment. We weren't representing him then, but no, it couldn't have been because that information wasn't obtained until after summary judgment. Okay, thank you. So I want to also talk a minute about the key train issue, because they focus so much on that, and the issue with the key train is that, in fact, it wasn't a material testimony in the trial testimony regarding the ability to obtain waiver. And I'll tell you why, because in the first instance, Hendrickson did not testify to this as a reason to not grant Ron a waiver, and the jury couldn't evidently, did make the determination, but not only did Hendrickson not testify that the key train was a reason for his decision, but also he affirmatively testified that there's not a different set of disciplinary rules for those on key trains, and in fact, an examination of the rules show that there is no different set of rules for key trains versus no key trains. Is this correct that Hendrickson testified, he didn't actually recommend firing Mr. Morris, did he? He thought was not sufficient to fire him. Correct. His original interrogatory answer said he did recommend, and then they changed it, and his testimony was he did not recommend his termination, and in fact, the person who conducted the investigation of Mr. Morris, Brett Russell, he also did not recommend Mr. Morris's termination. So that's just going on. And so the, and in fact, Mr. Hendrickson in his seven hours of testimony, he mentioned the word key train, I think just three times in the seven hours, and he even testified that he doesn't know if the comparator was using key trains or not, and in any event, Thomas Lynch testified he was also driving a train that had hazardous materials in it. Mr. Fox, you have four minutes left, and I'm also mindful that you have a cross appeal, correct? Yes. Do you want to say a word about that in your remaining time? Okay, yes. On the cross appeal, what we are cross appealing on is that Mr., is that Judge Cannelli failed to reinstate Mr. Morris after we asked, and we believe that reinstatement's appropriate in this case, and the District Court abuses discretion when it denies it. You know, Judge Cannelli cited to the Brusso case where it held, but in justifying the termination, but the Brusso case also held that the abuse of discretion standard that Judge Cannelli, the District Court is working under presupposes a reasoned exercise of that discretion, and a lack of explanation about the reason for a decision can be a sufficient showing to show abuse of discretion, and we've cited a number of cases in our briefs about that, but the court's rationale, the court's rationale was that Morris for not giving him the reinstatement was that Morris wouldn't enjoy the competence of management, and that there would be undue friction, but it didn't explain the basis for this, and in fact, Dello Pietro was the only witness called by BN in connection with the reinstatement, and in fact, as the testimony unfolded, it was clear, he didn't like Mr. Morris clearly, but he spoke only for himself, and not for BN generally on his example, how 10 other unnamed people felt about Morris, and this all was excluded as hearsay, except it's to his own state of mind. If Morris was to get his job back, he could easily work for other supervisors in other locations, and he wouldn't have to work under Dello Pietro, and there was, there's no testimony out there that he didn't enjoy the confidence and support of other managers in various stations that Mr. Morris could work at in the Chicago area, and not only that, you know, and I know there's a concern, nobody, you know, the elephant in the room is no judge wants to put somebody back in a train station, and then have, you know, in a train company, and then have him cause an accident, and then there's a headline, you know, 10 years later about something like this, and the fact of the matter is the federal rules, the Federal Railroad Administration Act, they have rules, and they certify these folks, and they have to be certified under the federal rules that they're competent and able to run trains. Not only that, BN, he has to get recertified every three years. BN has their own policies about having people, when people come back, and they have their own policies about training, and things that they have to do to prove that they're fit to run the trains. So Morris wouldn't be allowed to run the trains unless he passed the federal standards, and unless he passed BN's standards, and tests, and training, in connection with getting back into the job, and they have this available, because in arbitrations, frequently, people get their jobs back, and they have to have some system for doing it, and in fact, they have the system for doing that, and, you know, and more importantly, Mr. Morris was not nearly as bad as many of the comparators who had time, instance after instance of serious problems that went undetected, or that went without any significant discipline, and resulted in waiver, and we've cited too many, and you folks have, you know, referred to some with Kellen Smith having done, disabled the speeding, the speeding equipment on a train to make it go faster than it was allowed to go, and disabling some of the braking equipment, and while he was still on probation for that, he committed more violations, and got more waivers. So that's just one of many, and so for those reasons, we think that there was an abuse of discretion in not letting Mr. Morris go back, and finally, you know, I just want to mention that the lies that Mr. Hendrickson told, and that we uncovered, and we've already talked about some, which was the change of the interrogatory, but more importantly, Mr. Hendrickson did a declaration where he said that the reason for not giving Mr. Morris waiver was that he didn't accept responsibility. That turned out to be a lie, and he finally admitted on the stand that he did accept responsibility. So there were several issues like that. He also said that he didn't know Mr. Morris was black, but he did know Mr. Morris was black, and in fact, he had met and interacted with Mr. Morris. Mr. Fox, your time has expired, so you may want to wrap up. Okay, thank you, Your Honors, and just in closing, I would just like to say that this was a jury trial, and there was ample evidence along with the inferences to be drawn for the jury to have rationally reached this verdict, and we would like the district court to be affirmed, and we would appreciate remand for the reinstatement issue. Thank you. Thank you, Mr. Fox. Anything further, Mr. Neal? Yes, I'd like to make a couple of points, if I can. With respect to the first interrogatory and Andrea Smith, it is true that her name was not in it, but it did actually refer to her. It said that DNSF's Labor Relations Department reviewed the hearing and transcripts, and so she was referred to there, and that's why it's one of many reasons everybody knew all along that she was going to be part of the case, and keeping her out was really more of a gotcha. They knew it, and that's what the rule says. It's supposed to be an exception to exclusion. Everybody knew she was part of the case, except the defense lawyers. Well, they didn't list her, but maybe the reason they didn't list her is that it was inadvertence because everyone knew she was involved, and I'm not defending that, but the rules don't call for such a harsh penalty in this situation when the other side knows full well the person is involved, and with respect to... On that point, could you address Mr. Fox's point over the course of discovery and litigation? A lot of names come up. A lot of affidavits are submitted. Is a mention enough to avoid the sanctions, the strictures of Rule 37? The rules aren't clear about whether a mere mention is enough, but they are clear that in a situation like this, when you have a key person who has multiple touch points in the discovery process in terms of people referring to her, including Mr. Morris, that clearly has to be enough, and I want to say briefly why she is important, contrary to the other side, because the relevant adverse action here is termination of employment. It's not waiver and alternative handling. The jury wasn't asked about waiver and alternative handling. They were instructed on termination, and so you have to show proximate cause from earlier discrimination, and that's why Andrea Smith is most relevant, because she's the one that injected termination into the process. Just very briefly on Judge Scudder's question, I just want to clarify, when I said that Hendrickson was involved, I was saying he was in charge of the whole area, but there were a number of these comparators who he said he either was not or did not know whether he was involved in, so I didn't mean to misspeak and make it sound like he was involved in all of them personally, and I'm guessing my time is about up, so I'll just say that we're asking the court to reverse on the proximate cause and comparator issues and render judgment, but if you don't do that, the NSF really did not get a fair trial here, and we're asking that you at least remand for a new trial. Thank you, Mr. Neal. Thank you, your honors. The case is taken under advisement.